**SIGNED THIS: September 19, 2005**

_____
**THOMAS L. PERKINS
UNITED STATES BANKRUPTCY JUDGE**

_____

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| ALAN C. KENDALL, | ) | No. 04-85449 |
| Debtor. | ) | |
| | ) | |
| IN RE: | ) | |
| | ) | |
| BI-STATE PROPERTIES, LTD., | ) | No. 04-85450 |
| an Iowa corporation, | ) | |
| Debtor. | ) | |
| | ) | |
| IN RE: | ) | |
| | ) | |
| SAPPHIRE PROPERTIES, INC., | ) | No. 04-85460 |
| an Illinois corporation, | ) | |
| Debtor. | ) | |

## O P I N I O N

Before the Court is the motion filed by ALAN C. KENDALL, BI-STATE PROPERTIES, LTD., and SAPPHIRE PROPERTIES, INC., three related Debtors (individually referred to as "KENDALL," "BI-STATE," and "SAPPHIRE," and collectively referred to as "DEBTORS"), to approve the compromise reached with LaSalle Bank

National Association as Trustee for GMAC Commercial Mortgage Securities, Inc. Mortgage Pass-Through Certificates, Series 2000-C3, by and through GMAC Commercial Mortgage Corporation as its Special Servicer ("Bi-State Secured Lender"), and Norwest Bank Minnesota, National Association as Trustee for 1999-C1, by and through GMAC Commercial Mortgage Corporation as its Special Servicer ("Sapphire Secured Lender") (Sapphire Secured Lender and Bi-State Secured Lender are hereinafter jointly referred to as "GMAC"). A hearing was held on September 1, 2005, and the motion was taken under advisement by the Court. The parties have submitted written briefs which the Court has carefully considered.

The DEBTORS filed Chapter 11 petitions in early December, 2004. In February, 2005, GMAC, the principal lender for both BI-STATE and SAPPHIRE, sought relief from the stay.[1] After a final, evidentiary hearing in April, 2005, the Court issued its ruling denying the motion on the condition that the DEBTORS pay any unpaid post-petition real estate taxes and insurance premiums.[2] The Court determined that the value of the real estate in BI-STATE securing GMAC'S claim was $4,400,000 and estimated GMAC'S claim for purposes of the motion at $4,000,000, concluding that GMAC'S interest was adequately protected by, among other things, the equity cushion of ten percent.[3] Valuing the SAPPHIRE real estate securing GMAC'S claim at $7,665,000, the Court determined that

---

[1] Prior to the filing, GMAC had obtained a judgment of foreclosure against BI-STATE.

[2] At that same hearing, the Court allowed the DEBTORS' motion to use cash collateral, granting GMAC a first lien and security interest in postpetition rents.

[3] The Court did not determine whether amounts included by GMAC in its proof of claims for "yield maintenance amount" (or as referred to by the DEBTORS as a pre-payment penalty) as contractually provided for, were allowable.

GMAC had a relatively large equity cushion, noting that it had filed a proof of claim in the amount of $5,510,310.61. SAPPHIRE and BI-STATE filed plans and disclosure statements on April 4, 2005. The Court approved the disclosure statements at a hearing held on May 19, 2005.[4]

Throughout this period, the parties were negotiating.[5] After a day-long meeting on May 24, 2005, the parties reached an agreement. On June 15, 2005, the DEBTORS filed their first motion to compromise with GMAC. Regarding the compromise, memorialized as a "Term Sheet," as a stipulation to accept the plan, the Court, after setting the motion for hearing, directed the DEBTORS to submit a notice summarizing the compromise for transmission to all creditors.[6] For reasons unknown to the Court, the DEBTORS failed to submit the requested notice and the motion was dismissed on July 25, 2005.[7] GMAC filed statements rejecting the DEBTORS' plans.

On August 11, 2005, hearings were scheduled in BI-STATE on GMAC'S motion to reconsider the order denying its motion for relief from the stay and in both BI-STATE and SAPPHIRE on GMAC'S emergency motion for relief from the stay and to enforce the stay order, alleging that both BI-STATE and SAPPHIRE had failed to maintain insurance and

---

[4]The orders approving the disclosure statements were entered on June 16, 2005.

[5] Negotiations had begun by April 8, 2005, the date of a telephonic conference on the motion for relief from the stay. In May, GMAC brought in new counsel.

[6]A stipulation to accept a plan is a bankruptcy colloquialism that refers to an agreement between a debtor and a creditor that sets forth the terms of the debtor-creditor relationship that will apply beyond confirmation of a plan. In contrast, an agreement that governs the relationship only on a preconfirmation basis is ordinarily characterized as a stipulation for adequate protection. Because stipulations to accept a plan implicate the confirmation process, this Court will approve them only after a hearing or notice, with an opportunity to object, has been given to all interested parties.

[7]The hearing on the motion, set for Aug. 11, 2005, was stricken from the calendar.

3

pay real estate taxes.[8] At that hearing, the parties represented to the Court that an agreement had again been reached and that they would submit an agreed order allowing the motion for relief from the stay and a motion to approve their compromise, which again took the form of a "Term Sheet."

The DEBTORS filed the motion to approve the compromise with GMAC, which is the subject of this ruling, on Aug. 15, 2005. The Term Sheet, putting the DEBTORS on an express track for confirmation, required the DEBTORS to take the following steps: file motions to approve the compromise by Aug. 15th; file modified plans (satisfactory to GMAC) by Aug. 26th; file motions to secure indebtedness accompanied by satisfactory evidence of ability to close the loan by Aug. 26th; file reports of balloting by Aug. 31st; and serve notice of the confirmation hearing on the amended plan by Sept. 1st. The Term Sheet also fixed the following dates for actions to occur: court approval of the compromise by Sept. 2nd; court approval of motion to secure indebtedness by Sept. 30th; confirmation of the amended plans by Sept. 30th; and closing of the modification of GMAC'S indebtedness by Oct. 14th.

On the same date that the motion to approve compromise was filed, August 15, 2005, the parties submitted and the Court entered an agreed order for relief from the automatic stay ("Stay Order"). The Stay Order provided that the stay would be lifted as to GMAC upon entry, and provided for certain conditions to occur by certain dates, referencing and essentially tracking the steps required to be taken by the Term Sheet. The

---

[8] In BI-STATE, GMAC alleged that the DEBTOR had failed to pay real estate taxes, that the insurance had lapsed on July 10, 2005 and that it had advanced $63,997.90 as of August 1, 2005. In SAPPHIRE, GMAC alleged that it had advanced $1,191 to obtain force-placed insurance and that it had advanced $121,763.18 for real estate taxes as of August 1, 2005.

4

Stay Order then provided that "[U]pon failure to comply with any of the Conditions, the Lender is immediately authorized to take any and all actions in furtherance of its rights under state law including proceeding to foreclose its liens."

Both BI-STATE and SAPPHIRE filed first amended plans on August 25, one day before the deadline imposed by the Term Sheet and Stay Order.[9] The first amended plans provide that the treatment of GMAC'S secured claims are governed by the Term Sheet. A confirmation hearing is scheduled for September 29, 2005, with a date fixed of September 23, 2005, for the filing of written objections. On August 31, five days after the deadline of August 26 imposed by the Term Sheet and Stay Order, BI-STATE filed an application to borrow $750,000 from Richard J. Ryan (RYAN) secured by a junior mortgage on its real estate. BI-STATE attached a one-page term sheet for the subordinated loan, listing the date of the loan as on or before October 14, 2005. On that same date, SAPPHIRE filed a similar application to borrow $400,000 from RYAN, attaching a nearly identical term sheet. The hearing on those applications is also set for September 29, 2005.

A hearing on the motion to approve the compromise, which is the subject of this ruling, was held on September 1, 2005.[10] All creditors and interested parties received notice of the hearing, but none of them objected or appeared at the hearing. GMAC, however, advised the Court that it opposed approval of the compromise. GMAC contended that no binding agreement existed based on the Term Sheet because the DEBTORS had failed to comply with its conditions requiring the filing of motions to secure indebtedness by

---

[9]KENDALL also filed a first amended plan on that date.

[10]The Court interpreted the compromise as a stipulation to accept plan. Rather than request the DEBTORS to submit summaries of the compromise for purposes of sending out an objection notice, a hearing was set.

5

August 26, 2005, and by their failure to attach to those motions, as required by the Term Sheet "satisfactory evidence of the ability of [the lender] to close the requested loan." RYAN, testifying on behalf of the DEBTORS, elaborated on his plan to procure funds to make the loan. His ability to do so hinges upon his purchase of a one-half interest in three properties owned by Golden Properties, Ltd. (referred to as "GOLDEN"), a Chapter 11 debtor related to the DEBTORS here. RYAN, along with his children, is the owner of the other half-interest in the three parcels. On September 2, 2005, GOLDEN filed motions to sell its interest to RYAN and those motions are also set for September 29, 2005. BI-STATE and SAPPHIRE filed reports of balloting and motions to confirm the first amended plans on September 9, 2005, missing the August 31 deadline for the filing of the balloting reports.

In its brief, GMAC acknowledges that the Term Sheet is a binding agreement and contends that the DEBTORS materially breached the Term Sheet by (1) failing to timely file the motions to secure indebtedness; (2) proposing to borrow insufficient amounts; and (3) failing to attach satisfactory evidence of RYAN'S ability to make the loans. Going beyond simply opposing approval of the compromise, GMAC argues that the DEBTORS' breach of the Term Sheet entitles it to the relief provided for in the Stay Order.

Reorganization under Chapter 11 is best achieved through consensual reconciliation. Because deals are the heart and soul of the Chapter 11 process, bankruptcy courts enforce them as cut by the parties. *See, In re Charlie Auto Sales, Inc.*, 336 F.3d 34 (1st Cir. 2003); *In re Osborne*, 379 F.3d 277 (5th Cir. 2005) ("drop dead" clause in consent order enforceable by bankruptcy court); *In re Blanton*, 78 B.R. 442 (D.S.C. 1987); *In re Family Investments, Inc.*, 8 B.R. 572 (Bankr.W.D.Ky. 1981); *See also, In re Malmgren*, 277 B.R. 755 (Bankr.E.D.Wis. 2002)

6

(court's own "doomsday" order required *strict* compliance). Courts will not rewrite a contract to "give a litigant a better bargain than he himself made." *In re Krueger*, 192 F.3d 733, 738 (7th Cir. 1999), *quoting Maywood Proviso State Bank v. York State Bank and Trust Co.*, 252 Ill.App.3d 164, 625 N.E.2d 83, 88, 192 Ill.Dec. 123 (Ill.App. 1 Dist. 1993). It is clear from the procedural background and the history of these Chapter 11 cases set forth above that the parties' compromise was the result of intense, hard-fought negotiations between sophisticated attorneys. BI-STATE and SAPPHIRE were at a critical juncture in their reorganization efforts. As characterized by GMAC, the second deal was a "last ditch effort."[11]

The Stay Order, though by its terms it stands alone, is "part and parcel" of that Term Sheet. Both documents comprise the parties' bargain. Because the Stay Order has been entered by the Court and is binding on the parties, the Court can conceive of no reason to deny approval of the Term Sheet. The deal evidenced by the Term Sheet does not run afoul of any Bankruptcy Code provision or policy. Moreover, because the Stay Order remains in full force and effect, it would be inequitable to disapprove the Term Sheet. The Term Sheet and the Stay Order were part of a package deal. GMAC cannot enjoy the benefits of the Stay Order while rejecting the burdens of the Term Sheet.

Neither is the DEBTORS' failure to adhere to certain of the conditions a reason to deny approval of the Term Sheet which is the document that imposes those conditions. The parties have treated the Term Sheet as a binding agreement between them since

---

[11] In the DEBTORS' words, the Term Sheet was a "contract of adhesion" agreed to because the DEBTORS had no other choice.

August 11, 2005.  Approving it now merely gives a judicial imprimatur to it that, in effect, ratifies the reliance that the parties themselves placed on it.

This Court will, however, confine its ruling to the scope of the motion presently before it, only granting the DEBTORS' motion to approve compromise.  In the Court's view, approving the compromise says nothing about the effect of the DEBTORS' failure to satisfy conditions set forth in the Term Sheet and in the Stay Order.  No motion has been filed asking the Court to vacate or modify the Stay Order and the Court is disinclined to consider such an issue "by implication" in this kind of a case.  The Stay Order, drafted and agreed to by the parties, is in full force and effect and is enforceable according to its terms.

Despite GMAC'S plea for a ruling that the alleged defaults constitute a breach that justifies proceeding with foreclosure, the Stay Order, unlike some drop dead provisions which this Court encounters, does not contemplate any further judicial determination – it simply says "that upon entry of this Order, the stay shall lift as to the Lender" and "that upon failure to comply with any of the Conditions, the Lender is immediately authorized to take any and all actions in furtherance of its rights under state law including proceeding to foreclose its liens upon the Debtors' properties."  The Court refuses to be goaded into telling the parties what they meant in their agreement unless and until that issue is properly before it, which it is not on this Motion to Approve Compromise.[12]  The hearing on September 29, 2005 shall proceed as scheduled.

---

[12] Even if GMAC is free to proceed with foreclosure in state court, the properties remain property of the bankruptcy estates.  Theoretically, the DEBTORS could get back on track, pursuing confirmation of their first amended plans which incorporate their agreement with GMAC and obtain the subordinated loan by the date fixed by the Term Sheet.  *See, In re Allen*, 300 F.3d 1055 (9th Cir. 2002); *In re Lenox*, 902 F.2d 737 (9th Cir. 1990).  If the loans are actually obtained, it becomes more difficult to sustain a declaration of default based on failure to prove an ability to obtain them.

This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate Order will be entered.

###